UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | JUDGE CASTEL |
| Plaintiff, | No. _____ |
| v. | ECF Case (PKC) |
| THEODORE ROXFORD a/k/a LAWRENCE DAVID NIREN and HOLLINGSWORTH, ROTHWELL & ROXFORD, |  RECEIVED JUN 29 2007 U.S. ... CASHIERS |
| Defendants. | |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") alleges:

### NATURE OF THE ACTION

1. Between January 2003 and April 2007, Theodore Roxford, also known as Lawrence David Niren, through an entity he formed called Hollingsworth, Rothwell & Roxford ("HRR"), made a series of bogus offers to acquire publicly-traded companies. Roxford and HRR publicized the offers through internet message board postings, internet press releases, and in at least one filing with the Commission.

2. Roxford's intent in making the phony public tender offers was to manipulate the price of the target company's stock by inducing investors to purchase the stock of the target company. Roxford and HRR did not intend to complete the offers, and did not have the financial means to do so.

3. Roxford and HRR made false and misleading representations to the public regarding the existence of financial backers or banks that supposedly were interested in financing HRR's offers.

4. After Roxford and HRR's tender offers were publicly disclosed and reported in the press and in filings made with the Commission, the trading in the stock of several of the target companies increased as unsuspecting investors began buying the stock, in some instances, causing prices to rise.

5. By engaging in these acts, Roxford and HRR violated Sections 9(a) and 14(e) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 14e-8 thereunder. The Commission seeks a judgment from the Court: (a) enjoining the defendant from engaging in future violations of the Sections 9(a) and 14(e) of Exchange Act and Rule 14e-8 promulgated thereunder; and (b) ordering the defendant to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act.

6. Unless restrained and enjoined by this Court will continue to engage in, transactions, acts, practices, and courses of business that violate Sections 9(a) and 14(e) of the Exchange Act and Rule 14e-8 promulgated thereunder.

## JURISDICTION

7. The Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

8. The defendants made use of the means and instrumentalities of interstate commerce or of the mails in connection with the acts, practices, and courses of business alleged herein.

9. Venue is proper in this District pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa]. The court properly has venue over this action because certain of the conduct occurred in the Southern District of New York.

## THE PARTIES

10. The plaintiff is the Securities and Exchange Commission, which brings this civil action pursuant to authority conferred on it by Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)]. Defendant Theodore Roxford is the sole owner of HRR. Roxford's given name is Lawrence David Niren. He changed his name to Theodore Roxford in 1995. He has also used other aliases, including Theodore Vakil and Edward Pastorini.

11. Defendant HRR is a partnership that was formed in January 2003 by four persons, including Roxford. HRR describes itself as a firm specializing in mergers and acquisitions with a twenty-year history of transactional work.

## RELATED ENTITITES

12. Sony Corporation ("Sony") is incorporated in Japan and wholly-owns four subsidiaries that are incorporated and have their headquarters in the United States. Sony's common stock is registered pursuant to Section 12(b) of the Exchange Act. Sony's American Depositary Shares trade on the New York Stock Exchange.

13. Zapata Corporation ("Zapata") is incorporated in Nevada. Zapata's common stock is registered pursuant to Section 12(b) of the Exchange Act and trades on the New York Stock Exchange.

14. Edgetech Services, Inc. ("Edgetech") was incorporated in Nevada. Edgetech's common stock was registered pursuant to Section 12(b) of the Exchange Act and traded on the NASDAQ over the counter bulletin board. In 2007, Edgetech was acquired by Inova Technology Inc.

15. Playboy Enterprises, Inc. ("Playboy") is incorporated in Delaware. Playboy's common stock is registered pursuant to Section 12(b) of the Exchange Act and trades on the New York Stock Exchange.

16. PeopleSupport, Inc. ("PeopleSupport") is incorporated in Delaware. PeopleSupport's common stock is traded on the NASDAQ National Market.

### FACTS

17. This matter concerns a series of purported takeover attempts by Roxford through HRR. The attempts, described in detail below, follow a similar pattern: (1) Roxford and HRR informed the target company that they intended to make an offer for shares at a particular price; (2) Roxford and HRR publicized their offer on internet message boards and/or its website in an effort to increase the target stock price; (3) Roxford and HRR, lacking any prearranged funding for a takeover, were ultimately rebuffed or ignored by the target issuer; and (4) Roxford and HRR nonetheless publicly took credit for "originating" a transaction with the target issuer and, in correspondence with potential clients, touted their ability to "enhance shareholder value" by raising stock prices.

14. Each of these purported takeover attempts was simply a device to manipulate stock prices. In fact, Roxford and HRR succeeded in causing the prices of the stock of several of the target companies to increase for a period of time after the public disclosure of the tender offers.

15. Roxford and HRR have never secured funding for any of their purported takeovers

and had no reasonable basis for believing that they could carry out the terms of the offers.

## OFFERS FOR SONY CORPORATION

16. On February 7, 2003, HRR sent Sony's Board of Directors an unsolicited written offer to immediately purchase all Sony shares for $85 per share, for a total purchase price of approximately $78 billion. HRR's offer was contingent upon acquiring 51% of all outstanding shares of Sony stock and receiving approval from Sony's Board of Directors.

17. Just prior to sending the offer letter, Roxford and the other partners of HRR purchased 490 call options in Sony stock at $.25 to $2.05 per option, with strike prices of $40 or $45 per share. The HRR partners also bought 100 shares of Sony common stock at $38.84 per share.

18. The HRR partners purchased the options and stock in Sony because they believed that the news of HRR's offer would cause Sony's price per share to rise. HRR intended to profit from the options and stock and use the profits to finance expenses associated with the acquisition of Sony and possibly other companies.

19. HRR re-sent its offer to Sony on February 12, 2003, claiming that they "had a number of very significant clients who are very interested in Sony" and "who have billions of dollars." However, HRR had secured no financing sources for the Sony tender offer.

20. On February 16, 2003, Roxford called a member of the board of Sony and a senior executive vice president ("Sony director"), and asked him whether Sony was considering his offer. The Sony director told Roxford that Sony was not interested in the deal.

21. The next day, February 17, 2003, Roxford caused HRR to make a new offer to Sony, by e-mail, for $86 a share, despite lacking any financing to support the bid.

22. On February 21, 2003, Sony rejected HRR's offer, stating that "we have reviewed your materials and are not interested in commencing any discussions with you or your colleagues. We respectfully request that you immediately cease contacting us about this matter and all other matters."

23. On February 24, 2003, in response to Sony's rejection, HRR made its third offer to acquire Sony. A letter addressed to "all Sony Corporation shareholders" on HRR's website offered to pay Sony shareholders $86 per share. HRR's website posting also requested that Sony shareholders vote in favor of accepting the offer.

24. On March 14, 2003, HRR filed proxy solicitation material on the Commission's Electronic Data Gathering and Retrieval ("EDGAR") system, requesting that Sony's Board of Directors accept seven HRR proposals, including the sale of various Sony assets and subsidiaries.

25. Roxford sought to publicize his offers for Sony by contacting numerous media outlets.

26. By their offers to acquire Sony stock, Roxford and HRR intended to manipulate the price of Sony stock and profit from the rise in price. For example, in a January 16, 2003, e-mail to an employee of the private banking firm Brown Brothers Harriman, Roxford stated that HRR had been acquiring Sony shares and options, stating that, "The stock and the options will go through the roof as soon as our bid goes public." In that email, Roxford described his plan to profit from the rise in stock price:

> However, <u>on top of this - and this is where the real money is for all of us, - we will also be acquiring options on another 17 million shares that some of the major U.S. shareholders own, and we will be sharing the profits with you and with them on that</u>. . . <u>Should you decide to go forward with us as our investment bankers</u>, you need to know that before we go public, <u>your firm and our firm would have to delete permanently, and shred, every single piece of paper that was exchanged between us from today onward</u> . . . we have no doubt that there will be at least 3 to 4 other very credible bids that offer a great deal more money then we will be offering, and <u>of</u>

<u>course we will tender all of our shares and options to one of those bids</u>.  (Emphasis added.)

27.  On January 22, Roxford sent the Brown Brothers Harriman employee a second e-mail, using the codename "ALEPH" for Sony:

> The stock of ALEPH will go through the roof on the news of our offer, as the market will start to visualize what a breakup of ALEPH's assets could be valued at. . . <u>The only thing that is relevant here is the fact that we would have caused the stock of ALEPH to rise very substantially and very quickly . . . As for Hollingsworth, Mayer, Rothwell & Roxford, and whoever is our investment banker who lends us the $22 million: we will all share in the profits equally, and the profits will be close to $100 million in less than 3 months - as we will be selling our stock and options</u>. . . We trust that you will not buy stock or options in ALEPH or tell anyone about this deal other than those who are directly involved in it with your firm - as per Securities & Exchange Commission laws."  (Emphasis added.)

28.  HRR made numerous false representations about its experience and ability to finance the offers.  Roxford and HRR claimed to have been in "talks" with interested banks or financial backers, but none of these entities had made commitments to provide financing nor indicated to HRR or Roxford that they would participate in a hostile tender offer.

29.  The HRR website also contained numerous factual misstatements regarding HRR's experience and expertise.  The website claimed to have done "deals" with twenty-two listed entities, when in fact neither HRR nor Roxford had consummated any transactions with any of the listed entities.

30.  Roxford and HRR made the offers to purchase Sony with the intent to induce investors to purchase Sony and manipulate the price of Sony stock so that Roxford and HRR could profit from the sale of the Sony stock and options that they previously had bought.  They made the offers without the intent to commence the offer within a reasonable time, without the intent to complete the offer, and without a reasonable belief that they would have the means to purchase the

securities. HRR was unable to either exercise or sell its call options, and it lost its $32,000 investment in the options when they expired in March and April, 2003. HRR sold its 100 shares of Sony common stock on March 26, 2003 at $38.16 per share, resulting in a loss of approximately $68.

## OFFERS FOR ZAPATA CORPORATION

31. In March of 2003, HRR made repeated offers to acquire all of the outstanding common stock of Zapata.

32. On March 3, 2003, Roxford caused HRR to e-mail to Zapata an unsolicited offer to purchase all outstanding common stock for $45 per share. The offer said that HRR "can provide the financing for our offer for Zapata Corporation immediately." This offer would have required approximately $107 million in financing. HRR and Roxford in fact had not raised any portion of that amount.

33. Roxford sent Zapata another e-mail late in the evening of March 4, 2003, which also stated that HRR had pre-arranged financing.

34. HRR sought to publicize the offer by contacting media outlets and by posting messages to internet message boards.

35. On March 5, 2003 Zapata distributed a press release reporting the unsolicited offer. Upon Zapata's press release, the share price of Zapata common stock rose from the previous day's close of $36.39 to a high of $41.00 before closing at $37.78.

36. The Zapata trading volume on March 5, 2003 was approximately 34 times higher than the prior day and 2.7 times higher than the cumulative volume for the entire month of February.

37. This volume spike resulted in a temporary halt in trading.

38. Zapata rejected the offer in a March 7, 2003 press release.

39. On March 7, 2003, HRR sent Zapata a letter by e-mail stating that HRR is considering its options including "making [a] full tender offer together with all financing in place." Roxford and HRR still had no financing at this time.

40. On March 9, 2003 HRR offered to acquire Zapata for $50 per share, despite lacking the financing to complete the offer.

41. On March 11, 2003, Roxford caused HRR to send a letter by e-mail "TO THE BOARD OF DIRECTORS OF Zapata [sic] CORPORATION" stating that "our bankers would be pleased to meet with you and us together in regard to our $50 a share offer to Zapata . . ." In fact, there were no bankers who had agreed to finance the offer.

42. Zapata did not publicly reply to HRR's second offer, but filed a Form 8-K with the Commission on March 17, 2003, explaining that Zapata's bylaws and articles of incorporation have certain "antitakeover effects" including the requirement that a merger or acquisition must be approved by the 80% of the holders of all stock.

43. On March 17, 2003, Roxford caused HRR to send an e-mail to Zapata reiterating its $50 per share offer and stating that Zapata had until March 20, 2003 to accept the offer or HRR would take the offer directly to Zapata's shareholders. HRR further stated "We are working with our bankers to finalize all of our financing."

44. Zapata ignored these demands and HRR discontinued communications with the company.

45. Four months later, on July 13, 2003, when Zapata stock rose above $55 per share, HRR announced that since HRR had "achieved [its] objectives in enhancing shareholder value for all Zapata shareholders, [it is] hereby giving [its] support to the Board of Directors of Zapata."

46. HRR made false statements about its ability to finance the offers. Roxford and HRR claimed to have been in "talks" with interested banks or financial backers, but none of these entities had made commitments to provide financing nor indicated to HRR or Roxford that they were considering doing so.

47. Roxford and HRR made the offers to purchase Zapata with the intent to induce investors to purchase Zapata and manipulate the price of Zapata stock. They made the offers without the intent to commence the offer within a reasonable time, without the intent to complete the offer, and without a reasonable belief that they would have the means to purchase the securities.

## OFFERS FOR EDGETECH SERVICES, INC.

48. In July and August of 2003, Roxford and HRR made repeated offers to acquire Edgetech.

49. On July 30, 2003, HRR made an offer to acquire ninety percent of Edgetech's shares at $1.00 per share, contingent on Edgetech entering into a confidentiality agreement with HRR, retention of Edgetech's management, and Edgetech "publicly releasing this Letter Offer from HRR in its entirety in both Canada and the U.S. on a national scale in both countries."

50. On July 31, 2003, Edgetech issued a press release reporting the unsolicited offer and reprinting HRR's offer letter. The offer letter stated, in part:

> Having recently achieved success at enhancing value for Zapata corporation shareholders, which HRR discovered in early November at only 22 a share, and made a public offer for it on March 5, 2003 at 45, and then raised our offer on June 13, 2003 to 51 – Zapata shares have since soared to over 58 a share. It is our intention to achieve the same success for Edgetech shareholders as we did for Zapata shareholders . . .

51. On that day, the share price of Edgetech common stock rose from the previous day's close of $0.16 to a high of $0.75 before closing at $0.50. The volume spiked to approximately 11.5 million shares, 49 times higher than the prior day's volume of 234,200 shares.

52. Edgetech filed a Form 8-K with the Commission on August 6, 2003, reporting the unsolicited offer.

53. HRR made a second offer to Edgetech on August 8, 2003, increasing its offer from $1.00 per share to $1.15 per share. Edgetech filed a Form 8-K/A with the Commission on August 11, 2003, reporting the second offer.

54. On August 14, 2003, HRR made its third offer, stating that it has been "forced to revise our offer" since share prices have been "trading well below our offer price." The offer stated: "If the officers and directors of Edgetech, who own 40% of the Company, agree to pledge their shares to us at the same price as the other 50%, we will acquire the other 50% of Edgetech, from the rest of your shareholders at the highest price the shares trade at over the next 10 trading days, up to US $1.15 a share."

55. On August 18, 2003, Edgetech filed a Form 8-K/A regarding HRR's third offer. Edgetech stated that "Pending completion of the investigation of HRR and its offer, the Officers and Directors who own approximately Forty (40) percent of the shares of the Company are ready to accept a price of One Dollar Fifteen Cents ($1.15) per share."

56. On August 30, 2003, Edgetech announced that it had received an unsolicited offer from "Ferrari Investments of Argentina" for 100 percent of the shares at eighty cents per share. Ferrari is an alias or affiliate of Roxford and/or HRR.

57. Edgetech's announcement stated that the board previously had been told by HRR that Ferrari was a possible source of financing for HRR's offer for Edgetech.

58. On September 24, 2003, Edgetech filed a Form 8-K/A stating that Edgetech attempted to reach agreement with HRR. Specifically, Edgetech asked HRR to file a formal tender offer with the Commission. However, HRR did not take any responsive action. Therefore, Edgetech concluded, "Given the actions of HRR and their associates it now appears that the takeover bid had no substance."

59. Roxford and HRR made the offers to purchase Edgetech with the intent to manipulate the price of Edgetech stock. They made the offers without the intent to commence the offer within a reasonable time, without the intent to complete the offer, and without a reasonable belief that they would have the means to purchase the securities.

## OFFERS FOR PLAYBOY ENTERPRISES, INC.

60. On November 13, 2003, Roxford, operating either alone or with others, under a purported partnership named Barahona, Ferrari & Roxford ("BFR") made an offer to Hugh Hefner and Christie Hefner to take Playboy private. BFR offered to acquire, jointly with the Hefners, 100 percent of 27.4 million outstanding shares of Playboy at $23 a share, or $630 million.

61. Roxford claimed in a post on a Yahoo! message board that BFR was in discussions with two investors ("Investor A" and "Investor B") to finance the acquisition.

62. On November 11, 2003, Investor A, having seen the Yahoo! Posting, wrote Roxford, "I repeat, we have no interest in working on Playboy, and never have had any interest in Playboy."

63. Playboy also told Roxford that the Hefners also were not interested.

64. Roxford made the offer to purchase Playboy with the intent to induce investors to purchase Playboy and to manipulate the price of Playboy stock. He made the offer without the

intent to commence the offer within a reasonable time, without the intent to complete the offer, and without a reasonable belief that they would have the means to purchase the securities.

### OFFER FOR PEOPLESUPPORT, INC.

65. On December 21, 2004, Roxford sent an email to PeopleSupport offering to purchase the company for $14 per share. He did not sign his own name and instead used the name of a prominent Indian investor.

66. After doing some investigation and determining that the offer was not legitimate and had not come from the Indian investor, the company issued a press release stating that the offer was not legitimate.

67. On January 3, 2005, Roxford, posing as another foreign investor, made another offer for PeopleSupport, for $20 per share. This offer was publicized via internet message boards.

68. The price of PeopleSupport stock rose slightly on the dates of the two offers, as did the trading volume.

69. In a complaint filed on January 26, 2005 in the U.S. District Court for the Middle District of Florida, Roxford admitted that he had orchestrated the two false tender offers for PeopleSupport in anticipation of being paid a fee of $4000 plus 10% of profits earned from the increase in stock price for manipulating the price of the PeopleSupport stock.

70. Roxford made the offer to purchase PeopleSupport with the intent to manipulate the price of PeopleSupport stock. He made the offer without the intent to commence the offer within a reasonable time, without the intent to complete the offer, and without a reasonable belief that they would have the means to purchase the securities.

## FIRST CLAIM FOR RELIEF

### (Roxford and HRR)

### Violations of Section 9(a)(4) of the Exchange Act

71. The Commission realleges and reincorporates paragraphs 1 through 70 as if fully set forth herein. From at least January 2003 through May 2007, the defendants, in offering to purchase securities and by use of the means or instrumentalities of interstate commerce or of the mails, made, statements which, at the time and in light of the circumstances in which they were made, were false or misleading with respect to material facts, and which they knew or had reasonable ground to believe were so false or misleading for the purpose of inducing the purchase or sale of three securities traded on national exchanges (Sony, Zapata, and Playboy).

## SECOND CLAIM FOR RELIEF

### (Roxford and HRR)

### Violations of Section 14(e) of the Exchange Act and Rule 14e-8

72. The Commission realleges and reincorporates paragraphs 1 through 71 as if fully set forth herein.

73. From at least January 2003 through May 2007, the defendants (1) made untrue statements of material fact or omitted to state\ material facts necessary in order to make the statements they made, in light of the circumstances under which they were made, not misleading; (2) engaged in fraudulent, deceptive, or manipulative acts or practices; (3) in connection with a tender offer.

74. Defendants publicly announced that they intended to make a tender offer when they did not have the intent to commence the tender offer within a reasonable time and complete the offer.

75. Defendants publicly announced that they intended to make a tender offer when they intended, directly or indirectly, for the announcement to manipulate the market price of the stock of the bidder or public company.

76. Defendants publicly announced that they intended to make a tender offer when they did not have the reasonable belief that they would have the means to purchase securities to complete the offer.

77. By reason of their actions alleged herein, the defendants each violated Section 14(e) of the Exchange Act and Rule 14e-8 promulgated thereunder.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

### I.

Enter judgment in favor of the Commission finding that the defendants each violated the securities laws and Rules promulgated thereunder as alleged herein;

### II.

Permanently enjoin the defendants from violating Sections 9(a) and 14(e) of the Exchange Act and Rule 14e-8 promulgated thereunder.

### III.

Order the defendants to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act..

## IV.

Grant such other relief as this Court may deem just and proper.

Dated: June 29, 2007

Respectfully submitted,

*/s/ Richard E. Simpson*

Of Counsel:

Antonia Chion
Yuri B. Zelinsky
Lawrence C. Renbaum
Pamela H. Nolan

Sarah L. Levine (appearing *pro hac vice*)
Richard E. Simpson (#2375814)
Attorney for Plaintiff
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549
(202) 551-4769
(202) 772-9227 (fax)